Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

```
UNITED STATES OF AMERICA          )
                                  )
                                  )
            Plaintiff,            )
                                  )
   vs.                            ) No. C 21-8735 WHA
                                  )
UBER TECHNOLOGIES, INC.           )
                                  )  San Francisco, California
            Defendant.            )  Wednesday
                                  )  April 13, 2022
_____)  1:30 p.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:              U.S. DEPARTMENT OF JUSTICE
                            Civil Rights Division
                            950 Pennsylvania Ave NW
                            Washington, DC 20530
                    BY:  **MATTHEW J. FAIELLA, ESQ.**
                         **DAVID M. DE VITO, ESQ.**
                         **DAVID W. KNIGHT, ESQ.**


For Defendant:              WILMER CUTLER PICKERING HALE AND DORR
                            7 World Trade Center.
                            250 Greenwich Street
                            New York, New York 10007
                    BY:  **ALAN E. SCHOENFELD, ESQ.**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
        *Official Reporter - US District Court*
        *Computerized Transcription By Eclipse*

```
1   WEDNESDAY - APRIL 13, 2022                    1:28 P.M.

2                   P R O C E E D I N G S

3                      ---oOo---

4           THE CLERK:  Now calling Civil Matter 21-8735.  United

5   States of America versus Uber Technologies, Inc.

6       Will counsel please state your appearances for the record,

7   starting with the plaintiff.

8           MR. FAIELLA:  Hello.  I'm Matthew Faiella for the

9   United States.  I'm joined -- would you like me to introduce my

10  colleagues?

11          THE COURT:  Yes, please.

12          MR. FAIELLA:  I'm joined by David DeVito also for the

13  United States, and David Knight, and a paralegal from the

14  Department of Justice as well, Kashia Adams.

15          THE COURT:  Welcome to all of you.

16      And?

17          MR. SCHOENFELD:  Good afternoon, Your Honor.  Alan

18  Schoenfeld from Wilmer Hale for Uber.  I'm joined by Morgan

19  Jackson from Uber.

20          THE COURT:  All right.  Thank you.  Welcome to all of

21  you.

22      Okay.  This is a Motion to Dismiss, but before we get to

23  the Motion to Dismiss, I wanted to understand the Complaint

24  better.

25      What exact fee are you challenging here?  You just say
```

1   fee, but then you say "fees" plural, and it's -- almost just

2   struck this as an indefinite.  Are you challenging any fee or

3   fees?

4           MR. FAIELLA:  Yes, Your Honor.  We are challenging

5   Uber's, what it calls a wait time fee policy or program under

6   which they charge individuals who need more than two minutes

7   before the ride begins after the system, the Uber system,

8   determines that the vehicle has arrived at the pickup location.

9           THE COURT:  All right.  So you're not challenging

10  stow fees?

11          MR. FAIELLA:  No, we are not.

12          THE COURT:  All right.  It's only late fee, late fee?

13          MR. FAIELLA:  Yes, Your Honor.  These fees, we argue,

14  are actually charging individuals with disabilities for the

15  boarding time that they need, which is something that's

16  protected by the ADA.

17      So the way that we understand the program to work at this

18  point is that after the app determines that the Uber car has

19  arrived at a pickup location, if the car hasn't left the pickup

20  location and started the trip within two minutes, that the

21  passenger is charged a fee after that point.  It seems to be

22  permanent.

23          THE COURT:  Now, does that fee -- is it a one-time

24  fee or does it -- if after another two minutes does it double?

25  How does the fee work?

1          **MR. FAIELLA:**  Sure --

2          **THE COURT:**  Your Complaint doesn't say.  Your

3    Complaint doesn't say how the fee works.

4          **MR. FAIELLA:**  Yes, Your Honor.  We're not certain

5    exactly how it works from, you know, the same way Uber would

6    understand it.  But what our understanding is right now is that

7    it's a permanent fee.

8          So each minute that the car is at the pickup location,

9    after the two-minute mark, before the car law office the pickup

10   location, the user is charged a fee for each of those minutes.

11         **THE COURT:**  Okay.  You can have a seat.  That helps

12   me understand better.

13         All right.  Let's hear from Wilmer.

14         Now, you have gone way outside the pleadings.  How can I

15   possibly grant this motion, which you don't -- you try to tell

16   me how your fee works and it's all outside the pleadings.  So

17   I'm disturbed by that.

18         Let me give you an example.  Let's say that the guy in the

19   wheelchair is right there on the corner, but the Uber driver

20   parks across the street, which happens all the time, and they

21   stop.  Now, the -- the GPS, which is only accurate to about

22   half a block at best, sometimes in the city not that much, but

23   is going to start the two-minute thing, and it could be that

24   the guy can't even cross the crosswalk in two minutes to get

25   over to the other side to get in the car and, yet, you're going

 1    to hit him with a late fee.

 2         Now, that's -- none of that's in the Complaint, but your

 3    motion goes way outside the Complaint.

 4         So explain to me how -- just in that one situation that I

 5    gave you, how would it work.

 6         **MR. SCHOENFELD:**  So I think, Your Honor, you've

 7    described it correctly.

 8         There is -- once the car arrives as the GPS has

 9    determined, if the driver waits for more than two minutes for

10    whatever reason, for reasons having to do with a rider's

11    disability or not, the wait time fee begins to accrue at two

12    minutes, and it's a permanent fee.

13         So regardless of the reason for which the rider is

14    delayed, and it could be that they are in their house and it

15    takes longer for them to get down or they are at the location

16    that they have designated and it takes them longer to get into

17    the vehicle, under those circumstances a permanent wait time

18    charge will be assessed.

19         **THE COURT:**  But don't you think it's unfair in the

20    case I gave you?  Somebody is in a wheelchair and they are

21    trying to get across a street because your driver decided to

22    park over on the other side and they get hit with a late fee?

23    To me, that's not fair.

24         **MR. SCHOENFELD:**  I understand Your Honor's point.

25    I think the question here, obviously, is whether it's

```
1    impermissible under the ADA.  And I think what the regulations

2    that we've cited and the regulations the Government relies

3    on --

4             THE COURT:  You don't have a regulation on point.

5    You have stow fees.  This is not a stow fee.  So you don't have

6    any regulation exactly on point.  And none of the regulation

7    says anything about GPS and the vagaries of GPS, which we ought

8    to get discovery into.

9         We ought to bust this case wide open, get depositions

10   going, documents, so we can understand how it actually works,

11   as opposed to you to trying to say that it works exactly like

12   regulations that are not even on point.

13            MR. SCHOENFELD:  So the stowage fee is just an

14   illustrative example that the Department of Transportation has

15   given, but I do think the regulation --

16            THE COURT:  What is your closest regulation?

17            MR. SCHOENFELD:  It's 49 C.F.R. 37.5.

18            THE COURT:  I want my Law Clerk to give me the C.F.R

19   Do we have the C.F.R., the book?  Do any of you lawyers have

20   it?

21            MR. SCHOENFELD:  I have the text printed out.  It's

22   highlighted --

23            THE COURT:  That's the best I can do I guess.

24        (Brief pause.)

25            MR. SCHOENFELD:  I hope you'll forgive my
```

1    highlighting.

2             THE COURT:  Hand it up.  Hand it up to me.

3        (Whereupon document was tendered to the Court.)

4             THE COURT:  And thank you.

5        All right.  So small that print.  Okay.

6             MR. SCHOENFELD:  Sorry.

7             THE COURT:  Go ahead.

8             MR. SCHOENFELD:  Sure.

9             THE COURT:  So it's 49 C.F.R. 37.5(d)., and it says:

10            "An entity shall not impose special charges not

11       authorized by this part on individuals with

12       disabilities, including individuals who use

13       wheelchairs, for providing services required by this

14       part or otherwise necessary to accommodate them."

15       And that's the regulation that the Government proceeds

16  under.  There are other regulations they proceed under as well.

17  But what this regulation says is that what's forbidden is not

18  charges, but instead it's special charges or what other

19  provisions call higher charges and surcharges.

20            THE COURT:  Let's say your late fee was ten seconds

21  and that 99 percent of everybody or 90 percent could do it in

22  ten seconds, but the disabled would almost never be able to do

23  it in ten seconds.

24       Wouldn't that have an unequal burden on -- on those people

25  in wheelchairs?

1          **MR. SCHOENFELD:**  I don't think so.  I think the point

2     of this regulation, and the commentary that I point Your Honor

3     to, commentary on 37.5(d) speaks directly to what this means.

4     It says:

5               "The prohibition on special charges applies to

6          charges for service to individuals with disabilities

7          that are higher than charges for the same or

8          comparable services to other persons."

9          The reason the stowage fee example is important here is

10    because it defeats the Government's theory that if a person

11    with a disability needs a particular accommodation, in all

12    cases it's impermissible to charge them a fee.

13         The stowage fee example says:  If you charge a generally

14    applicable fee -- let me know if I'm going too fast.

15         If you charge a generally applicable fee, you can charge a

16    dollar for a wheelchair just as you charge a dollar for a

17    suitcase.  That means a person in a wheelchair will always pay

18    a dollar more to use a transportation service.  They have to

19    use their wheelchair.  They have to pay their dollar fee in

20    order to use the vehicle.  And any other person can make the

21    choice about whether to stow luggage or not.

22         And DOT specifically says, speaking to that illustration,

23    that is not a surcharge and there is no obligation to waive the

24    fee.  There is --

25              **THE COURT:**  But that -- but the stow fee, they are

 1   not challenging that.  They are challenging late fees.

 2          **MR. SCHOENFELD:**  I understand, Your Honor.  But I

 3   think the logic applies with equal force here.  Again, the

 4   language of the regulation and DOT's general interpretation of

 5   the regulation.

 6          The stowage fee isn't -- isn't part of the regulation.

 7   It's an illustrative example.  What matters is the regulatory

 8   language.  I agree with Your Honor that point.

 9          What the regulatory language says is if you charge a

10   generally applicable fee, it is not an impermissible surcharge

11   or higher charge or special charge.  And here this fee applies

12   to everyone under all circumstances.

13          And as the Government acknowledges at Page 10 of their

14   opposition, the fee will be assessed against a person with a

15   disability if that person with a disability is late for reasons

16   having nothing to do with their disability.

17          So there are lots of circumstances where this wait time

18   fee applies that have nothing to do with a delay caused by the

19   disability, which is what the Government, I think, acknowledges

20   in their opposition is the only circumstance under which the

21   late fee is impermissible under the statute.

22          But the regulations make clear, 37.5 and then 37.29, that

23   these sorts of fees that are generally applied don't

24   discriminate within the meaning of the statute.

25          The -- the additional guidance that I would just point

1   Your Honor to is the DOJ guidance, which I think speaks to this

2   as well, which is also speaking to this notion of surcharge or

3   special charge or higher charge.  And what DOJ has said in its

4   authoritative interpretation is that when a professional bills

5   on the basis of time, it's not impermissible for him to charge

6   more on account of delays that are occasioned by a disabled

7   person's disability.

8        DOJ spoke to that in the context of their surcharge

9   regulation, which is trying to accomplish the same goal here,

10  which is to make sure that people with disabilities aren't

11  charged more for the accommodations that the law requires to be

12  provided to them, but just that they are treated equally even

13  if the incidents of the fee falls in a way that is unavoidable

14  by the person with a disability.

15            **THE COURT:**  Okay.  Hold that thought.

16       Let's hear from the Government on that.  What is your best

17  authority --

18            **MR. SCHOENFELD:**  Do you want me to sit down?

19            **THE COURT:**  Please.  I'm going to give you a chance

20  to respond.  But the other side points to regulations that seem

21  to say it's okay to -- you know, you don't have a -- you can't

22  have a special charge for a disability, but you can -- so why

23  isn't this -- there is no special charge they say, so they are

24  innocent.

25       So what is your best regulation or your best decision that

1   says they are not innocent?

2          MR. FAIELLA:  Yes, Your Honor.  I think a helpful

3   case is from the Ninth Circuit in the *McGary versus City of*

4   *Portland* decision where the Ninth Circuit deemed violative of

5   the ADA a nuisance fee that was imposed on a person who had a

6   disability who needed --

7          THE COURT:  What kind of fee?

8          MR. FAIELLA:  A nuisance fee or a fine.

9          THE COURT:  Nuisance?

10         MR. FAIELLA:  Yes.  Because the individual's front

11  yard wasn't clean enough, and the person needed more time to

12  clean their yard because of their disability.

13       And similarly here, we have individuals with disabilities

14  who need more time to complete boarding a vehicle.

15         THE COURT:  Okay.  Go back to the -- tell me the

16  facts.  How much time was allowed and how much time did the

17  occupant say they needed.  Give me the facts of the case a

18  little bit better.

19         MR. FAIELLA:  Sure, Your Honor.  It will take me just

20  one second.

21         THE COURT:  It has nothing to do with transportation,

22  by the way.

23         MR. FAIELLA:  Yeah.  It was an individual with --

24  whose disability included having -- living with Aids and was

25  actually hospitalized for a period during which the city had

 1   decided that he would be fined if he weren't to complete the

 2   clean-up of his yard.  I don't know exactly off the top of my

 3   head how long that was.  I believe it was at least a matter of

 4   weeks, and he was asking for extensions in excess of months.

 5        And there the Ninth Circuit, you know, recognized that the

 6   city's policy was being evenhandedly applied in a neutral

 7   manner to individuals with and without disabilities, but the

 8   ADA calls for entities to reasonably modify their policies when

 9   their policies result in extra fees or discrimination being

10   perpetrated against people with disabilities.

11        So here Mr. McGary was not allowed to be charged under the

12   ADA for this essentially late fee because he needed more time

13   to --

14             **THE COURT:**  Well, did the decision actually go that

15   far?

16        What my Law Clerk just handed me in that decision said it

17   needed more factual development.

18             **MR. FAIELLA:**  Yes.

19             **THE COURT:**  That wasn't a holding that flat out said

20   he was going to win.

21             **MR. FAIELLA:**  You are correct.  Yes, it was

22   actually -- it had been dismissed by the District Court and the

23   Ninth Circuit reversed that and said that there needed to be

24   more development, but that he had a claim under the ADA for

25   reasonable modification.

```
 1              THE COURT:  I know, but we don't know whether he was
 2     going to win or not.  It depended on how the facts came out.
 3              MR. FAIELLA:  And here --
 4              THE COURT:  All right.  So this is not such a great
 5     decision for you.  It's sort of, sort of in your camp.
 6          What's your next best decision?
 7              MR. FAIELLA:  Well, we would point to the Baughman
 8     versus Walt Disney Company case, also from the Ninth Circuit.
 9     And in that case it was individuals who were -- with
10     disabilities who wanted to use Segways instead of wheelchairs
11     at the amusement parks, and Disney's policies prohibited Segway
12     use.
13          And their claims in the Ninth Circuit were deemed valid
14     under the ADA because the Ninth Circuit stated that people with
15     disabilities -- or entities, excuse me, like the amusement park
16     here, have to consider what the experience is for people
17     without disabilities and then seek to provide a like experience
18     to people with disabilities.
19          And so in denying, you know, people with disabilities who
20     need to use Segways because of their disabilities the use of
21     those Segways, they were not allowing them full and equal
22     enjoyment of the services of the amusement park.
23          Here people with disabilities who need more time to board
24     Uber vehicles because of their disabilities are not getting
25     adequate boarding time, which is required by the Department of
```

1   Transportation's regulations implementing the ADA.  They are

2   being denied that equal treatment, full and equal enjoyment of

3   the transportation services that Uber provides to people

4   without disabilities.

5        People without disabilities who are ready at the pickup

6   location when the car arrives and begin boarding promptly can

7   get into the car under Uber's decided two-minute wait time

8   period.  But people without disabilities, like Passenger A, who

9   is described in our complaint and has quadriplegia and relied

10  on Uber twice each weekday for a year while living out of state

11  and in a different city to participate in a rehabilitation

12  program, well, she wound up paying charges to Uber, many, many

13  charges over the course of that year because she needed more

14  time to board the vehicle.

15       So she was actually charged higher fares and fees than

16  individuals without disabilities who would have been getting

17  into the car when the car arrived the way she was.

18            **THE COURT:**  Well, out of 100 -- help me understand.

19  How of 100 disabled wheelchair-bound persons, how many times

20  has it occurred that they need more than two minutes?

21            **MR. FAIELLA:**  Your Honor, I'm not sure the answer to

22  that question.  I don't know -- in terms of Uber's ridership,

23  we just don't have facts at this point to know how many of

24  Uber's users have disabilities, whether they are mobility

25  disabilities or other types of disabilities, that would require

```
 1    them to need more time to board.
 2         We do know and we describe in our Complaint about somebody
 3    like Passenger A with quadriplegia or --
 4              THE COURT:  Yeah, I read that.  But that's just one
 5    person.  I think they were in Kentucky.
 6              MR. FAIELLA:  Uh-huh.  Yeah.
 7              THE COURT:  So that's one.  And out of the entire
 8    United States you found an excellent example.
 9         But what if that's the only example?  Let's say A and B
10    are the only two.  How frequently does this problem come up?
11              MR. FAIELLA:  We know that it includes more than just
12    two people.  We've -- you know, through, you know, very early
13    discovery, like initial disclosures, we have provided
14    additional names to the defendant, but we actually think that
15    Uber is in the best position to know how many people with
16    disabilities were charged these discriminatory fees.
17         We know that Uber has been on notice for years.
18    Passenger B put Uber on notice years ago that because of his
19    cerebral palsy, he needed more time to board an Uber vehicle
20    when it arrived.  And eventually they denied him refunds for
21    his -- of his wait time fees, which are really fees for his
22    boarding time.
23              THE COURT:  All right.  Let me jump to a different
24    question.
25         From Uber's point of view, they have the problem, Uber has
```

1    the problem, of customers who call.  Let's say, fully

2    able-bodied customers.  And then they dwaddle around and they

3    are 20 minutes late or ten minutes late.  Time is money and so,

4    therefore, the driver loses out.

5         So how would you solve this problem and accommodate the

6    disabled in this situation?  How would you run the company?

7              MR. FAIELLA:  Sure.  Well, you know, an example that,

8    you know, would be helpful would be perhaps to let individuals

9    with disabilities state to Uber that they'll need more time for

10   their boarding, because boarding time is protected by the ADA,

11   and because they shouldn't be charged extra for it.  And

12   because Uber has an obligation to reasonably modify, which is

13   an affirmative obligation, it should know that people with

14   disabilities are simply at times going to need additional time

15   to board, more than the two-minute mark that Uber set.

16        And so I would allow individuals with disabilities to let

17   me know that that is their situation and waive the fee for them

18   so they are not charged the fee.  And they don't have to both

19   pay extra for the service --

20             THE COURT:  Well, what would they say?  Would they

21   say that when they arrive at the vehicle or do they say "I'm

22   disabled" at the time they call up the car on the app?

23             MR. FAIELLA:  I mean, you know, I'm not a technology

24   person, but my understanding is that they could even do it when

25   they register with Uber; that they could identify as needing

1  more boarding time than two minutes because of their disability

2  and that they can then not be charged these fees.

3      That would -- to me, without knowing more about the

4  company's design and how it works, that would seem pretty

5  reasonable.

6          **THE COURT:**  Well, what would you do in a case where

7  the wheelchair person is not actually there at the corner

8  waiting?  They, themselves, are dwaddling in the restaurant,

9  and they are late and then they want to get -- they want to

10  avoid the fee all together on account of being disabled.  What

11  would you do in that case?

12          **MR. FAIELLA:**  I mean, there are individuals that are

13  the drivers of these cars.  And so I don't understand why one

14  of the drivers couldn't note:  Hey, even though this

15  individual -- you know, this individual didn't yet arrive at

16  the pickup location.  It seems like that would be a reasonable

17  approach in a situation like that for the rider to -- to

18  actually, you know, keep track of who's actually at the pickup

19  location.

20      But you also described a scenario where sometimes drivers

21  are across the street and people with disabilities might take

22  even longer to get across the street.  So there would certainly

23  have to be meaningful oversight of that kind of policy to

24  ensure that discrimination didn't continue.

25      Also, if I may, just go back quickly to the *Disney*

```
 1   decision, wanted to warn against the Ninth Circuit, what the
 2   Ninth Circuit called, you know, a retrograde approach where
 3   there the Ninth Circuit recognized that Disney's argument was
 4   that, you know, people could use wheelchairs instead of Segways
 5   to get around, so why not let them just use wheelchairs and
 6   deny them access to Segways.  And the Ninth Circuit said:
 7   Look, you know, this kind of an argument can be stretched, and
 8   it can result in retrograde results, which would include
 9   telling a person who uses a wheelchair:  Well, you could get up
10   stairs if you dragged yourself.  We don't need to install a
11   ramp.
12        And here I will say Uber's argument that because its
13   drivers are not merely pulling way from passengers with
14   disabilities as they are boarding it hasn't violated the ADA,
15   is that kind of a retrograde argument that the ADA protects
16   against.
17             THE COURT:  Let me give the other side a chance to
18   respond.
19             MR. SCHOENFELD:  Sure.  Thanks very much, Your Honor.
20   I will try to address the point that you raised with the United
21   States in order.
22        With respect to the cases that the United States relies
23   on, *McGary* and *Baughman*, neither of them involved a regulation
24   that speaks to the conduct at issue and says:  It is not a
25   violation of the statute.  It's non-discriminatory, and there
```

1    is no obligation to waive the fee in those circumstances.

2        *McGary* involved a situation where the city denied the

3    request for a modification.  Mr. McGary told them, "I need more

4    time to do this."  And the city said, "No, we don't give you

5    more time."

6        As alleged in the Complaint, when the people call Uber and

7    say, "I was delayed on a particular ride on account of my

8    disability," the United States recognizes that Uber has a

9    policy of refunding that money --

10       **THE COURT:**  The Complaint says that they -- they

11   would refuse to refund.

12       **MR. SCHOENFELD:**  With respect to Passenger B at a

13   certain point in time they stopped refunding money.  And so if

14   the litigation is about whether, you know, a particular refund

15   might be adequate or a particular process might be adequate, I

16   think that's one thing.  But that's not the Government's theory

17   here.  The Government's theory here is that the imposition of

18   the charge at all violates the ADA.

19       And so to distinguish both *McGary* and *Baughman*, you know,

20   this is a circumstance where regulation speaks, in our view,

21   directly to this conduct.  And the challenge is, as the Ninth

22   Circuit recognized in *Harkins*, *Arizona versus Harkins*,

23   businesses are allowed to rely on these regulations to organize

24   themselves.  And it's unfair for the United States, or any

25   party, to come in and say there is some other obligation that

 1  falls on them when the regulations speak directly to it.  So I

 2  think that distinguishes both *McGary* and *Baughman*.

 3       And in terms of the best case, I would point Your Honor to

 4  Your Honor's own decision in *Szwanek versus Jack In The Box*,

 5  which the Ninth Circuit affirmed, and that case was one where

 6  the plaintiff alleged that a particular policy imposed a

 7  different or higher burden on people with disabilities.

 8       **THE COURT:**  That was a close case, and the

 9  distinction in my mind there was a -- the burden was on

10  pedestrians, because anybody that was in a car could go in

11  there use the -- but a pedestrian could not go in to the

12  restaurant after 10:00 o'clock or whatever it was.

13       So I -- I feel like it was two steps removed from your

14  case, where the burden is directly on the disabled person in a

15  wheelchair.

16       **MR. SCHOENFELD:**  But I don't think it is on the --

17  the burden is directly on a person with a wheelchair.

18       And I think -- just to go back to *Szwanek*, I don't think

19  the Ninth Circuit relied necessarily on that distinction.  They

20  acknowledged that where a fee that is neutral on its face

21  applies equally to people who are disabled and not disabled for

22  whatever reason, then it's not discriminatory.

23       But, again, I don't even think the Court gets to the

24  question of whether the fee falls differently or higher on

25  people with disabilities when you have these regulations that I

 1   think speak directly to this.

 2        The second point, just to go to the United States

 3   argument, you know, their view is that because a separate

 4   regulation requires adequate boarding time, you can't charge a

 5   fee that is somehow related to the boarding time a person with

 6   disabilities takes.

 7        The same is true, again, of stowing a wheelchair.  There

 8   is a regulation that requires transportation service providers

 9   to stow wheelchairs and, yet, DOT speaks directly to whether a

10   transportation service provider can charge a neutral

11   non-discriminatory fee to people with wheelchairs.

12        So, again, I think the entire premise of the Government's

13   argument that Uber violates the statute when it charges a fee

14   that somehow is associated with a service that's otherwise

15   required under the statute is defeated by that reg.

16        We cite another reg in our reply brief where the

17   Department of Transportation says:  Look, if an air carrier

18   needs to make a second seat available to a person with a

19   disability, either because of their size or because the

20   conditions of their disability makes it such that they occupy

21   two seats, you can charge that person for the second seat.

22   You're not required to waive the fee associated with that fee.

23        So what I think is the logic behind these is that where

24   the transportation service provider is providing a service, a

25   costly service to a person with disabilities, and they are

1  applying that -- incurring that cost and applying that fee on

2  an equal evenhanded basis, even where it will apply to

3  particular disabled people in every single case and even where

4  they cannot access the transportation service without paying

5  that fee, DOT has said that doesn't violate the ADA.  And --

6           THE COURT:  But you don't have a case exactly on

7  point on these late fees.  There is no regulation exactly on

8  point.

9           MR. SCHOENFELD:  I concede that.  I don't think the

10 Government has one either.

11          THE COURT:  Well, then, right.  So maybe we have to

12 fall back on the statutory language.

13          MR. SCHOENFELD:  But there are certainly plenty of

14 cases, and I think *Harkins* is one, where the Ninth Circuit

15 relied on specific regulatory language and didn't go into the

16 general prohibition of the statute.

17      That was a case about whether close captioning and open

18 captioning were required in movie theaters.  And the Court said

19 close captioning is required.  There is no requirement for open

20 captioning and resort to the kind of general principles of the

21 ADA doesn't require us to provide open captioning as well.

22      There is the *Abercrombie* case from the Tenth Circuit that

23 we cite.  There is the *Amtrak* case, which arises under these

24 same regulations, both DOT and DOJ from the Eastern District of

25 Pennsylvania.  And there, too, the Court makes clear that once

```
 1    you've complied with regulatory language, the kind of
 2    overarching aims of the statute don't supplement those
 3    obligations.
 4         So I grant you that there is nothing speaking directly to
 5    this.
 6         I will say that for that -- that I think the case law on
 7    surcharges, special charges and higher charges, is uniformly in
 8    our favor.  I grant you that none of it arises in this
 9    particular context.  None of it relates to wait fees.
10         But it all relates to fees that are charged for a product
11    that people with disabilities can never avoid using.  Gluten
12    free food for people with celiac disease.  Plus size clothing
13    for people who are obese, and their obesity qualifies as a
14    disability.  Wheelchairs and the stowage fee example.
15         Again, I'm not going to sell you a false bill of goods on
16    what the case law says, but in terms of both the logic of these
17    cases, they uniformly support the view that Uber is advancing
18    here.
19         And I think to go back to Harkins, when you have a
20    regulation that speaks to this, a business is entitled to rely
21    on it in organizing their affairs and knowing that DOT has
22    looked in the special context, transportation service
23    providers, and concluded that imposing a fee equally to people
24    with disabilities and people without disabilities, even where a
25    person with disabilities will never be able to avoid incurring
```

1    that charge, it doesn't violate the statute.

2             **THE COURT:**  Okay.  I will give you a very brief

3    response, please.

4             **MR. FAIELLA:**  Thank you, Your Honor.

5         I'd like to respond just to a few points there.  First of

6    all, here Uber is trying to use a narrow exception articulated

7    in the regulatory appendix to swallow the rule.  The full and

8    equal enjoyment mandate of the statute, the ADA, is what should

9    control here and lead the analysis.

10        The Department of Transportation was entrusted to protect

11   certain aspects of the transportation experience for people

12   with disabilities.  In doing so they protected adequate

13   boarding time.  The same way they protected accompaniment by a

14   service animal.

15        And if you read the appendix that Uber cited about

16   37.5(d), that appendix -- first of all, the regulation itself

17   calls on not charging for required services or reasonable

18   modifications.

19        And also the appendix notes that an entity can't charge

20   for accompaniment by a service animal.  And a service animal is

21   another requirement, another service requirement listed under

22   Section 37.167 of the DOT regs.  Section 37.167(i) is where you

23   find adequate boarding timing required.

24        So when you read that section and you read the appendix,

25   you actually -- that's a way to read it consistent with the

1    ADA, as opposed to Uber trying to use a stowage fee example to

2    swallow a rule here.

3        You can't charge a person who needs a service animal the

4    same way you can't charge a person who needs adequate boarding

5    time.  Doing so would -- would be leading to the retrograde

6    results that are guarded against in the Ninth Circuit's

7    *Baughman* decision.  So I just wanted to state that first.

8        I also wanted to note that the Air Carrier Access Act

9    regulation that Uber has cited, I think it's incompletely

10   cited.  The regulations work as a whole under the Air Carrier

11   Access Act to prohibit charges for required services.  And one

12   of the required services under that Act includes time for

13   preboarding for people who self-identify as having a

14   disability-based need to preboard.  And so that's actually a

15   principle that is consistent with the United States claim.

16       The Air Carrier Access Act provision that they cite about

17   charging for an extra seat is not applicable and, once again,

18   shows their gimmicky approach in trying to use an exception to

19   swallow the rule.

20           **THE COURT:**  All right.  Have a seat.  Thank you.

21       All right.  I'm going to rule from the bench and deny the

22   motion.  I have a few comments to make.  It's kind of like that

23   Oregon case.  We need -- and I feel I need a lot more facts to

24   be -- to be able to tell whether or not this falls -- which

25   side this falls on.

1      It's true that we have a regulation that says an entity

2  shall not impose special charges on individuals with

3  disabilities, but we're not dealing with that.  We're not

4  dealing with a special charge.  And the fact that there is a

5  regulation that says you cannot do something, that a special

6  charge is illegal, does not automatically legalize everything

7  else.

8      And so the statute still has the requirement that if the

9  modification is discrimination, where the modification is

10  necessary to afford such goods, services, facilities and so

11  forth to individuals with disabilities, unless the entity can

12  demonstrate that making such modifications would fundamentally

13  alter the nature of such goods, services and so forth.  So

14  the -- the issue under the statute is what modification would

15  accommodate those who are disabled and would those

16  accommodations be fundamentally alter the nature of the goods

17  and services.

18      Now, you all may understand the fact patterns better than

19  me, but the pleading is bare bones and the Complaint -- I'm

20  sorry, the motion goes outside the pleadings.  And I still

21  don't know how this actually works in practice.

22      Let me give you a practical example.  The refund policy.

23  Does Uber -- let's say somebody gets in a cab.  They are

24  disabled and it takes them three minutes.  So they get hit with

25  a fee.  All right.  Do they get hit with a fee automatically?

1    Or does the driver have discretion to say:  Okay, I'll waive it

2    because you're not -- you're in a wheelchair.  Or what if the

3    passenger says:  I'm in a wheelchair.  I need add few extra

4    minutes and I don't want to get hit with an extra fee.  Please

5    refund that.

6         What happens in that situation?  What is the practice,

7    actual practice on the ground, and you've got to get into the

8    records of the company.  Get into the records of the company.

9    Take depositions -- just a second.

10        (Discussion held off the record between the Court and

11         the Law Clerk.)

12        **THE COURT:**  My Law Clerk tells me that the Complaint

13   says that the drivers don't have discretion.  Maybe that's not

14   true.  It won't be the first time that the Government has

15   alleged something that turns out to be untrue.  I don't know.

16   The depositions will tell us what's true.

17        And here is another thing I've learned in these cases.

18   The Government is afraid to take depositions.  The Government

19   won't take depositions until every single document in the

20   universe is produced.  Don't do that to me.  You get in there

21   and start taking depositions even before you get all the

22   documents, because we're going to have a fast trial in this

23   case.  It's going to be this year.  Not fast, it will be

24   reasonable.

25        Now, I got interrupted.  I've forgotten where I was.

1      I think what I was saying is I want to understand in

2  practice on the ground how the refund policies actually work in

3  practice.  So if every single disabled person has always gotten

4  their money back, then there is no complaint, I think.

5      However, I doubt that that's true.  But how -- how close

6  to being true is it?  We don't know.  We should find out.

7      Another thing is how does this fee work?  Let's say how

8  often does it occur that they park across the street on a busy

9  street and it takes four minutes before the light even changes

10  so they can get over there.  And how accurate are these GPS

11  things anyway?  It doesn't -- it starts with when the GPS tells

12  them.

13      Well, have you ever figured out that the GPS -- sometimes

14  doesn't Waze tell you that you're in a certain location when

15  you're not?  How accurate is that GPS thing?  Well, I'd like to

16  know that, too.

17      The -- the ultimate -- and then there is a question of on

18  its face it's a neutral policy, but what is the actual burden

19  on the disabled?  Is it just a rare case, or does it come up

20  all the time?  Does it really -- is it really the case that the

21  burden of this policy is dramatically more on the disabled than

22  it is on -- now, if this was a late fee that started after ten

23  minutes, then I would probably say:  Look, this -- everybody,

24  even the disabled, can get into the car in ten minutes.  But if

25  it's two minutes, I don't know.  That's a lot closer call.  And

1    how much time does somebody in a wheelchair need?

2        Well, I can guarantee you that if it's across the street

3    on a busy street, it's going to be more than two minutes.  But

4    how often does that occur?  Well, I don't know.  I don't know.

5        That's where it -- depositions.  That's where records.

6    That's where getting in there and actually doing the hard work,

7    that's where you've got to get going on this and do not delay.

8    If you delay, I'm not going to -- please don't.  Please don't

9    do what the Government does in other cases, which is:  I insist

10   on every document in the universe before you take the first

11   deposition.

12       They get to take depositions, too.  You get to go to

13   Kentucky, take the deposition of that person in Kentucky.

14       All right.  I think Uber has made some good points on

15   these regulations.  I'm not sustaining their entire theory, but

16   there are some regulations that tend to show that a neutral

17   policy is okay.

18       So the Government is going to get a chance to make its

19   case and show undue burden, if that's the test, but I've

20   forgotten what the test is.  I think it's undue burden.

21   Disproportionate burden.

22       Okay.  Now we're going to turn to -- just tell me, I'm

23   going to treat this as a case management conference.  Discovery

24   starts effective today.  Give me the date you want for a trial

25   date that will be this year.

```
 1          What does the Government want?  Otherwise I'll pick it for
 2     you.
 3              MR. FAIELLA:  Your Honor, I haven't consulted with
 4     everybody --
 5              THE COURT:  Well, too bad.  This is the time.  You
 6     consult with me.  What -- what does your schedule permit?
 7              MR. FAIELLA:  I'm thinking about briefing in a couple
 8     of other matters.  Would sometime in November be --
 9              THE COURT:  Yes, that would be good.  How about
10     November 7th.  November 7th?
11          November 7th.  Hearing no objections, that's going to be
12     our trial date.
13              MR. SCHOENFELD:  Your Honor, I apologize, but my
14     client says he has another trial on November 7th.
15              THE COURT:  All right.  Well, then, let's go with
16     November 14th.  I'm happy to give you Thanksgiving week.
17     Thanksgiving week would be a good week.  Let's go with that.
18              MR. SCHOENFELD:  Sorry.  I apologize.  His trial is
19     the week of November 22nd.  So --
20              THE COURT:  All right.  So we'll stick with
21     November 7th, all right.  All right.  So I'll get out a case
22     management order.
23          Are there any other case management issues that you see
24     coming down the pike?
25              MR. FAIELLA:  We have been working with Uber's
```

```
 1   counsel to engage in mediation.  At this point we are aiming to
 2   schedule something for, I believe, May 12th or 13th.
 3              THE COURT:  May 12th -- all right.  Do you have a
 4   mediator picked out?
 5              MR. FAIELLA:  Yes, we do.
 6              THE COURT:  Who is that?
 7              MR. FAIELLA:  It's Judge Laporte.  L-A-P-O-R-T-E.
 8              THE COURT:  Laporte in May.  Okay.  That's fine.
 9         This is not a class action.  So this is -- I'll let do you
10   that.  It's the Government.  You're not going to do an illusive
11   deal.
12              MR. SCHOENFELD:  Your Honor?
13              THE COURT:  Yes.
14              MR. SCHOENFELD:  The case is referred to the ADR
15   program to Judge Vadas, and the parties then spoke and are
16   planning to work with Judge Laporte.
17         Do you want us to file a stipulation formally relieve
18   Judge Vadas?
19              THE COURT:  Yeah, you better do that, but I also will
20   try to get that rolled into my case management order.
21              MR. SCHOENFELD:  Okay.  The order referring to Judge
22   Vadas is on the docket, and we were going to file a
23   stipulation.  So we're happy to do it however Your Honor
24   prefers.
25              THE COURT:  Wait and see if I can get it rolled into
```

1  my case management order before you go to all that trouble.

2        **MR. SCHOENFELD:**  Sure.  And we have let Judge Vadas

3  know that we're planning on working with Judge Laporte.

4        **THE COURT:**  Okay.  That would be great.  But don't

5  you need to take some discovery and get in there before you do

6  any mediating?  Look at records.

7        **MR. FAIELLA:**  Yes, Your Honor.  Under General Order

8  56 of the Northern District of California, we did have some

9  preliminary settlement discussions with Uber, and through those

10 discussions got a little bit of insight into some of its

11 practices.  And we are hoping that through mediation we can

12 gain proper insight in the interest of figuring out a remedy

13 here that will work.

14       **THE COURT:**  Okay.  I hope that works.  But, listen.

15 One thing you cannot do to me is come back to me in June and

16 say:  Oh, Judge, we know we were supposed to be taking those

17 depositions, but we didn't because we told you all about

18 judge -- you should be doing them all simultaneously.  Two

19 tracks.  Huckley buck.  Go down the huckley buck track of

20 discovery and of mediation.  That way you will be ready for

21 trial and you won't be asking for continuances of the trial

22 when November comes.

23      Okay.  I think I've done all the damage I can do for one

24 day.  So motion denied.  Without prejudice to a number of good

25 points they have made.  But I want to have a more developed

1  record on how this system actually works before I say that it's

2  okay or not.

3       Okay?  Thank you.  Have a good day.

4       (Proceedings adjourned.)

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*

<u>**CERTIFICATE OF OFFICIAL REPORTER**</u>


        I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.



_____

        Debra L. Pas, CSR 11916, CRR, RMR, RPR

                Friday, April 15, 2022